oral argument not to exceed 15 minutes per side. Mr. Tymon for the appellate. Your Honor, I'd like to reserve two minutes for rebuttal please. May it please the Court, Matt Tymon for Joe Reiner. The only issue in this case is whether the unconstitutional admission of out-of-court statements at the trial of my client, Mr. Reiner, was a harmless error. And this Court's precedent makes clear that it was not because it was the most important evidence in the prosecution's case against my client and because, as this Court has said in prior cases, the evidence would be materially weaker without that evidence. The prosecution's case would have been materially weaker without that unconstitutionally admitted evidence against my client. The standard in this case is set by Brecht v. Abrahamson. The question is, did this unconstitutional admission of testimony have a substantial and injurious effect or influence on the jury's verdict? And there are many cases in this Court, confrontation clause cases, that address that standard and apply that standard. And they go through the five Van Arsdale factors that apply to confrontation clause cases. And when this Court applies those factors, as we do in the brief, the result is clear. This was the most important evidence in the case against my client. That's shown not just by a review of the record, but by the prosecutor's reliance on those statements in both the opening and the closing arguments. There was no physical evidence against my client. There was no DNA evidence. There were no fingerprints found at the scene. There was no blood. There was no confession. No one saw him at the scene of the crime. No one said he did it. There's what is purported to be his signature on a document that's dated and located at the scene of the crime. Is that right? The document is not located at the scene of the crime. What kind of document is it? It is a receipt that was found at the gold shop that the owner of the gold shop is... It would have been received at the gold shop, then, right? That's right. So I don't know whether the receipt was located, but it's attached to the gold shop. I mean, it relates to the gold shop, right? That's right. The gold shop is where the murder occurred. No, no, that's not right. I mean, that's where the jewelry was actually taken from, I see. Yes, that's right. And there are two important points about the receipt. You use the word purportedly. I think that's exactly the right word. It's purportedly by the prosecutor. Okay, we don't have the receipts in this record. The prosecutor says this is his signature. There's no thumbprint, no fingerprints from my client were found on that receipt. His name does not appear on that receipt. Is this not in evidence? The receipt is in evidence. It's not before this court because it has not been transmitted with the record on habeas review for this court. Why not? The government put in the record at the district court level, Your Honor. Now, there's a problem with the authenticity of the signature. My understanding is this was supposed to be a signature for the date of the murder, which is I think the 23rd, but there was no expert testimony that said this was your client's signature. Is that right? That is right. Okay. And it was only that the prosecutor at trial said, well, it looks like his signature or something like that? That's right. Was there an objection to that? I mean, it seems like to me there should have been, but there wasn't in the state court? I don't believe there was an objection by trial. It came in unobjected, but it's still a statement of counsel, which is not evidence. That's right. So the jury in the state court was allowed to figure out if they thought it was his signature? Is that what happened? That is true. The jury was allowed to figure that out, but I want to make a very important point about that receipt. The receipt does not say that whoever was the signature signed that receipt sold the ring that belonged to the woman who died. Okay. It didn't tie it to the ring. Okay. That's right. So the most he'd say was he was in there and pawing something that day. If we were to conclude that the jury... If you got past the... I mean, that shouldn't have come in at all, obviously, but... But he might not have objected to it because there was this other evidence that was before them that cured or superseded that. That, for some reason, came in. Absolutely. And that evidence... What are we talking about there? I don't... Oh, okay. So that is... And I should be clear. The evidence that we're talking about that came in that was unconstitutionally admitted was out-of-court statements from the owner of the gold shop. Oh, yeah. Yeah. Okay. Okay. Well, go ahead. What we're talking... I thought we were talking about... I thought we were talking about other receipts or something. Oh, no, no, no. There are other receipts. I'm just saying why he might not have objected to the receipts is because this non-confronted evidence was there. And the state court had ruled that it was admissible. I don't know under what ground, but the state court of appeals said, no, there was a violation of the Confrontation Clause. So I can't even imagine how the state trial judge said that this would be admissible, but... Okay. All right. I understand. Okay. So it's true. If we were to conclude that the jury read the signature and decided it was the same as another signature that was authenticated to be his... We don't really want the jury to do that, but... Well, sure. Okay. But let's say the jury... Here's the other important part. We don't know that the jury actually did do that. Okay. And so even if under Michigan law, it was acceptable for the jury to have done it, we don't know that that's what happened because of that superseding evidence that Judge Rogers just referred to. The statements that came in for some reason from the gold shop owner, the jury didn't really have to look at the receipt. The jury was told that the owner of the gold shop said, here's the ring that Mr. Reiner gave to me on the day that this took place. And then another witness said the ring belonged to the woman who was killed. The receipt would just corroborate the owner's testimony. Only in part. And that's important. It would only corroborate it to the extent that it would place him at the gold shop on the day of the incident. Not... That's very important. It doesn't show that he actually sold the ring. And so even if this court were to conclude, okay, the jury can look at that signature that we can't see and think that it was his signature, that doesn't get anywhere close to he sold the ring. There was an argument by the state in its brief that I'm sure will come up today that that receipt, again, if we credit the receipt as his, the receipt said $2 worth of gold was sold. The ring was found in a costume jewelry box that the state will say, that's worthless jewelry. And so therefore, the jury could infer that what he sold was worthless. The ring was worthless. Okay, probably the same thing. And that doesn't quite work because the tin of jewelry, the costume jewelry I just referred to, had a variety of items in it. That's the prosecutor's language. There was no evidence as to how many. There was no evidence as to in the period of time, it was two days between the day that this incident took place and when the detectives went to investigate at the gold shop, how many other items had been sold, how many other people had come in. It's completely circumstantial evidence and it requires quite the inference to conclude that it was, in fact, her ring that was sold by Mr. Reiner. The only evidence that put that before the jury was the evidence that never should have come in. These statements from Mr. Lewandowski, purported statements according to the detectives. The Supreme Court has this five-part test for evaluating this kind of issue in the Crawford context? That's right. What's that case name? The Van Arsdall case, Delaware, Vietnam. That's the case I'm thinking about. Now, to what extent is that five-part test tailored for Crawford kind of situations, confrontation clause kind of situations? And to what extent is it just a reflection of what Abramson says anyway? It's a confrontation clause test, Your Honor. The five factors... Why should the test be separate and more nuanced for confrontation clause situate violations? I don't think there'd be a problem if there were nuanced tests for every single kind of violation. It just so happens that... Well, I just wonder whether maybe it's a easier to meet test because of the difficulties that Crawford created in cases such as this. I don't know that I think it's easier to meet. And also, the Van Arsdall case preceded Crawford. It's a 1986 case. Crawford is 2004. So Van Arsdall just said, when we were reviewing confrontation clause cases, here are the five factors to consider. It's not really a test that's easy or difficult to meet. It's five factors that we should consider. And then Brecht came along and said, on habeas review, here's how we determine whether an error is harmless. That's that substantial and injurious effect or influence on the jury's verdict. So this court, many times, has combined those two tests and said, OK, it's habeas review. We ask whether there's a substantial and injurious effect or influence on the verdict. To figure that out, we look at these Van Arsdall factors. And they're set out in the brief. And again, they've been applied, actually, a number of times by this court. One example is the Fulcher case. I think it's from 2006. And they show something that we say a number of times in the brief. The inquiry is not, if you remove this one piece of offending evidence, would the rest of it be enough to sustain a conviction on sufficiency review? That's not the question. And you can see that both because the court has said it a number of times and because of the way the court has applied the test. In the Fulcher case, there was testimony properly admitted where someone said, I saw Mr. Fulcher commit this murder. That was set aside from the offending evidence. And so even though that was allowed in, it was part of the remaining evidence, this court still said that the offending evidence, other out-of-court statements by the girlfriend of the defendant, had a substantial and injurious effect on the verdict. And the idea there is the jury had the evidence as it was put forth to it. And the question is, did the evidence that is being discussed, the improperly admitted evidence, have that kind of effect on the verdict? The question is not, what would, in some hypothetical case, the jury have done with the remaining evidence? And so just to briefly go through the five factors, I won't take much of the court's time. The first factor is, how important is the evidence? Every court should review this. Even the state court says, this is important evidence. It went to the heart of the prosecution's case, the state court said. This court has said, where evidence is significant to a prosecution's case, it cannot be harmless error under the Chapman standard. Even the state, in its brief, says, this is important evidence. So there's really no dispute about that. Second question is whether it's cumulative. And that's where the discussion of the receipts comes in. The state will say, it's cumulative evidence, these out-of-court statements, because the receipts show something. They're going to try to say that they show the same thing that the out-of-court statements do. But that's not true. The receipt, even if we credit it, even if we think the jury looked at the receipt and said, yes, this is his signature, only gets you to the conclusion that he was at the pawn shop on that day, not that he sold the ring. And that's the important evidence, because that is the only thing connecting him to the crime scene. That's why I was going through, there's no DNA, no fingerprints, et cetera, right? There's no physical evidence connecting with the crime scene. Did they try to, you know, if they tried to get fingerprints, DNA, all that stuff? I do, actually. There were three witnesses who testified for the state, two evidence technicians and one fingerprint examiner. They both detailed everything they did to canvas the crime scene, go through the receipts at the gold shop, too, for fingerprints. Didn't find any fingerprints. Couldn't match them to his. The only thumbprint that was matched to his were from other receipts from prior dates at the gold shop that we know were his. And so I do think that's telling. It's not as if there were no fingerprint examiners available in the state of Michigan at this time. They came and testified at trial, and they couldn't find his fingerprints. They couldn't find his DNA. So that's cumulative. Third factor is whether there's anything corroborating it. It's really the same analysis. The only difference, I think, is that sometimes there can be evidence corroborating offending evidence, but it doesn't quite get so far as to be cumulative. Here, there's neither. Fourth factor, the state doesn't contest the extent of any other cross-examination. Here, there was no cross-examination whatsoever at Mr. Lewandowski. And then the fifth factor, I think we've discussed at some length, the strength of the remaining evidence. And it's just not very strong. So unless there are further questions, I'll reserve my further time for rebuttal. Thank you. Thank you. Good morning, your honors, and may it please the court. Jared Schultz, assistant attorney general on behalf of the state of Michigan, on behalf of the respondent. The issue in this case is simple. Did the improperly admitted statements have a substantially injurious effect or influence on the jury's guilty verdict in this matter? The answer to that question is no. The Michigan Court of Appeals reasonably determined that these improperly admitted statements were harmless error. And this court should come to that conclusion for three reasons. First, the facts that the improperly admitted statements established in this case were also established by other properly admitted evidence. And that mainly includes the receipts that have already been discussed here today. Those receipts, there were, I believe, three or four of them. The first, at least two receipts identified the petitioner, Joseph Rainer, by name and had his thumbprints on those receipts. They're different dates. They're not dates of the murder, though. Correct, your honor. But that shows that he was a customer at the pawn shop. Doesn't mean he murdered this person. Right. But then the receipt from February 23rd does show that. That receipt contained a signature which matched the other receipts. Okay. I mean, there is no expert testimony that that was his signature. And the only testimony was the prosecutor's argument that looks to me like it was his signature, which is just totally admissible. Right. And well, your honor, I believe it is admissible because they compared the signature to the other signatures. Lay people can be experts on signatures? I didn't think that. Well, it doesn't take expert testimony to, or expert witness to compare two signatures that might look exactly alike. It doesn't? No, no, your honor. That's something lay people can do? Well, I think you can look at a signature and say, well... Okay, I'm just asking you, is that the rule of evidence in Michigan now? Well... That you don't need expert testimony as to the authenticity of signatures? Just yes or no. If you could cite me a Michigan case, go ahead. No, your honor, I can't do that. But to authenticate a document in Michigan, it's just you have to show that this is what the proponent claims. No, but a signature is different though. Right. I mean, you're saying for signatures, expert testimony is not necessary. Lay people are totally qualified to render such opinions. And I don't think that's the law in Michigan. Maybe it is, but... Well, I don't think there's a specific case that says you can't. Well, all right. I'd have to look at it. But anyway, even if you said that this was his signature, as counsel for petitioner has argued, it doesn't tie it to the ring. I believe it does, your honor. Oh, okay. Well, the signature says on the receipt, it's his signature, and it says he received $2 for items he brought in that day. That's pretty... That's low value for... Gold too? It's... No, well, I don't believe it's gold. It might have some gold on it. It was some sort of ring with... Okay, so the receipt said gold, no? Your honor, I'm not sure about that. But it's... Does it say gold ring? It does not say ring at all, your honor. Okay, all right. So the most you got is maybe he got $2 for something he pawned on the day of the murder, and that establishes basically beyond reasonable doubt that he committed the murder. No, your honor. Along with all of the other circumstantial evidence... Okay, the other... Okay, what else you got? That he's found in the area, he's found seven miles away, and he's picked up and taken to the bus stop. I mean... Your honor, he's in a remote area in the middle of winter, where it is very uncommon to see anyone walking. How far away is he from the murder scene when he... He's less than half a mile from the murder scene. Okay, he's a half a mile from the house. Okay, so you got the receipt, he's a half a mile from the area. What else you got? Well, then he's seen again another less than half a mile from the area. And he's also in the area another half a mile. Okay, what else? Well, then he's very suspicious when he is picked up by this other witness. He's suspicious. He's sweating. He's suspicious a half a mile away from the murder scene. I mean, really, it's really nothing. Your honor, I guess I would respectfully ask you to think about what this would mean if this is nothing. This is a man who has no business being in this area. He makes up an excuse for being there that doesn't pan out. He gives alternate reasons for being there. Then he gives... I mean, to go to the pawn shop because he pawned something. No, no, that's seven miles away. The pawn shop's... Well, it's a couple miles to where they do a transaction. It's a couple miles more at a bank. There's a couple miles more to where he's dropped off at a bus stop. And then the bus stop is seven miles away from the gold shop. And he gives various excuses for why he needs to be dropped off near that bus stop. Like he wanted to meet a friend there or he wanted to get unemployment, go to the unemployment office. Then he gets out of the car, removes his cap, which makes no sense in the middle of winter. Then he goes to a bus stop. He never told the witness that he wanted to ride at a bus stop. He's making excuses. He's making... He's trying to throw the guy off to where he's going, what he's doing. And then the key part of this case, Your Honor, is that he was the only one seen in this area, in this remote area. And then he was also at the pawn shop on the day of the murder. You know, we allow somebody to be convicted of murder and sentenced to life in prison based upon that thin of evidence. I mean, to me, that doesn't even establish sufficiency of the evidence. And that's not even the standard here. All we have to decide is whether there is a substantial injurious effect on the jury's verdict. But I can't see... I mean, what evidence is left... I can't see that getting past a motion for acquittal. I mean, I would think it would be... Well, I don't take quite that position. But I don't doubt that you had enough evidence without this evidence that should have been excluded. But the strongest thing you have, it seems to me, is the three receipts. The two receipts which could cause a juror to know what the signature of this guy looks like and that he sometimes goes to this store. And then the other receipt which looks like it came from him because it has the same signature. But your opposing counsel says those aren't even in the record. Were they in the state court record? Yes, Your Honor. They were admitted into evidence. Correct. All right. So somebody could have objected if they weren't admissible, if they were admitted. Right. And I think that's exactly the point. Counsel didn't make an argument in closing argument because he knew the signature was exactly what... Either that was the reason or he knew that there was this other evidence that shouldn't come in that made it something that was a moot point. But either way, I don't understand why we don't get to look at it. Why isn't it in the... If it's in the record, why doesn't it go to the habeas court? That's mystifying. Well, Your Honor... This is what you say is the most important thing. I don't think it's the most important thing. I think there's... What could be more important? Not then. There's not been the time to even being in the place where this ring came from. Right? Well, absolutely. Or where he took it. I'm sorry, where he took it. You mean besides the receipt? Yeah. And the improperly admitted evidence. No, there's not. But why that receipt is not in this record, I'm not positive. I do know that in Michigan courts, they do not always... Any exhibit does not always go with the record. So when we get our... Who's responsible? Pardon my ignorance. Who's responsible for getting the state court record into the federal court in a habeas case? That's the government's responsibility. Absolutely, Your Honor. All right. So it's the government's responsibility and it's the part of the record that most strongly supports the harmless error determiner, the Brecht determination of the state court, right? Sure. Yes, Your Honor. Well, that seems strange. Well, Your Honor, again, I... Because it's weight. I mean, I can look at that and say, oh, that's compelling. Or I could look at that and say, it's not compelling at all. But I'm no expert. Maybe I'm not allowed to do that. Well, Your Honor, again, exhibits in Michigan state courts don't travel with the record all the time. Sometimes they do, sometimes they don't. If you want us to look at something in the record, you have to put it in the record. Yes, that's absolutely... You rely on something. Judges, I want you to rely on this and you haven't submitted it. You haven't sustained your burden of producing. Is that the case? Is Judge Griffin correct in what he just said? Well, we have not produced this receipt. That's correct, Your Honor. However, you mentioned burden, Your Honor. The burden, under Brecht, he has to prove there's a substantial and injurious effect or influence or that there was... I thought once the error was established, the government had to prove it was harmless. Well, that's under Chapman. That's not necessarily under Brecht. That's not under Brecht. Oh, under Brecht, yeah, it's ambiguous, his burden is. It is ambiguous. Whether you as a judge find that it's a substantial injurious effect. I think it's odd. But if it doesn't also Brecht or there's a standard by some cases that if it is totally equal, then it's still the government's burden, which is what the burden is about anyway. Well, if the judge is in grave doubt about whether this had an substantial injurious effect or influence... Then the government loses. Correct. But, Your Honor, we also have to realize that under Davis v. Ayala, we still have to apply epidefference in this case. Okay, you're arguing that and I think that's an interesting argument and I'm inclined to there's Brecht, but to me Brecht is a higher standard of harmless error than EPA. So if you satisfy Brecht, you would by almost necessity or implications satisfy EPA. So I think theoretically we should apply both, even though our authority is Brecht prevails. But the practicality is if they went under Brecht, they went under EPA too, don't they? Yes, that's what... Okay, so it's more theoretical than anything else. Yes, Your Honor. I guess I make that argument as to look at the state court's decision in this case and you have to conclude that reasonable jurists could not debate that that was wrong. And I don't think you can do that in this case. Whether you look at it as EPA standard or whether you look at it as under the Brecht standard, I just simply don't think you can conclude that this is an unreasonable application of the harmless error analysis or that it had a substantial injurious effect or influence. And I think you really have to look, and again, Petitioner's counsel does a good job of looking at every little piece of evidence and poking holes as to why that doesn't show his guilt. But you have to look at all the evidence in total here. And I just, I don't think you can say that someone who was at the scene half a mile, less than half a mile from the scene around the time of the crime, a place he does not belong, not necessarily doesn't belong, but he has no connection to that case and then is also seen that same day or also on that same day, sells a piece of jewelry. It just so happens that the victim's ring ends up at that very same place that he was at. I just don't know how you can conclude that anything other than he sold her ring that day and by... And that he murdered her too. That's another inference, by the way, that you have to say since he had her property that he must have murdered her. I mean, that's another inference. Well, he was seen at the scene seven miles away. Seven miles away. I know there's a lot of people seven miles away. Right. No one else was seen in this remote place. The fact that he's been a customer of the pawn shop and he was seen seven miles away means he must have murdered her. I mean, I think it's scary if we put somebody in prison for the rest of their natural life on those facts. I understand your hesitation. But in contrast, if a ring was stolen from the murder victim and showed up by virtue of the defendant at the pawn shop, that would be some sufficient evidence. The trouble is that's all shown by a confrontation violation. But it's also shown by the receipts. Well, but not as clearly because there's no mention of the ring. It's one thing to say he came in with a ring that is by testimony the same or very similar ring to the ring that was taken from the murder victim. That's going to grab a juror. But then you take that away and you just say, well, he was in the pawn shop. It's just not as much. Well, the police officer also testified that he saw the ring in a tin of low value jewelry. I mean, how many other people is it possible that could have been in the shop on the day of the crime and also within half a mile of the murder scene, which is seven miles away in a remote area? I mean, I think when you look at an additional, how could it not be that otherwise wasn't there because of the confrontation violation? That's the difficulty I have. I'm not sure. It's like there's a chain which leads to a conclusion. And one step of it is tied like this when you have the confrontation violation evidence. But when you don't have that confrontation violation evidence, it's another weak link instead of another strong link in this chain. It makes the chain that much weaker. It's still there, but it's a lot weaker. And to have that part of it and to say, well, it's got several links, but at least this one, we have something tight, that might be enough. Sure, I just can't see how that's not. Your Honor, I guess I disagree that it's substantially weaker. I don't think it's weaker at all. Again, he sold something that day. As opposed to, he brought in a ring, a blue ring. But it was found in low value custom jewelry. He sold low value. The ring was not attached to him except by an inference. That's correct, Your Honor. Whereas with the confrontation violation evidence, there's direct evidence that the ring is tied to him. That's correct. That's direct evidence of one. One step. I understand. It's kind of a key step, though. Well, I guess, and I see I'm out of time, Your Honor, but I would just point out that there. Yeah, I'm sorry, Your Honor. When you look at all the evidence as a whole, I think that it did not have a substantial majority's effect on the influence on the jury verdict. I would also point out that the prosecutor of Petitioner's Counsel says he was using this statement several times in opening and closing. It was actually two statements in each opening and closing that referred to direct statements by Mr. Lewandowski. All the rest you can infer from the evidence as I've been arguing so far today. So I would just ask that this court affirm. Thank you. Any more questions? Just very briefly, as to the very last thing that my opponent said, it's not true that this evidence was referred to only twice in the opening and closing. All the quotes are in the brief, so you can take a look. But I guess most importantly, in closing, the prosecutor said the next critical thing is Mr. Lewandowski's testimony. He referred to the testimony as critical. And it was. Thank you. Thank you. Mr. Timon, I noticed you were appointed to this case under the Criminal Justice Act. Yes, that's right. Court recognizes that you do that as a service to the court and our system of justice and done an exemplary job. So thank you very much. Thank you. Thank you very much. Appreciate it. Case having been submitted in the know.